**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Warren E. Peterson

    v.                                          Civil No. 14-cv-432-LM
                                                                Opinion No. 2017 DNH 018
William Wrenn, Commissioner,
New Hampshire Department of
Corrections, Richard Gerry,
Christopher Kench, Lester Eldridge,
Roger Provost, Kelly Jardine, Paul Cascio,
Michael Marden, Jon Fouts, Brian Baxter,
John Masse, and Charles Boyijian

**O R D E R**

    Before the court are defendants' motion for summary
judgment (Doc. No. 41) and plaintiff Warren E. Peterson's
objection and cross-motion for summary judgment (Doc. No. 49).

**Summary Judgment Standard**

    Summary judgment is warranted where "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a); see also
Xiaoyan Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir.
2016).  "An issue is 'genuine' if it can be resolved in favor of
either party, and a fact is 'material' if it has the potential
of affecting the outcome of the case." Xiaoyan Tang, 821 F.3d
at 215 (internal quotation marks and citations omitted).  At the
summary judgment stage, the court draws "'all reasonable
inferences in favor of the non-moving party,' but disregard[s]

'conclusory allegations, improbable inferences, and unsupported speculation.'" Fanning v. Fed. Trade Comm'n, 821 F.3d 164, 170 (1st Cir. 2016) (citation omitted), cert. denied, 85 U.S.L.W. 3324 (U.S. Jan. 9, 2017).

"A party moving for summary judgment must identify for the district court the portions of the record that show the absence of any genuine issue of material fact." Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016).  Once the moving party makes the required showing, "'the burden shifts to the nonmoving party, who must, with respect to each issue on which [it] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [its] favor.'"  Id. (citation omitted).  "This demonstration must be accomplished by reference to materials of evidentiary quality, and that evidence must be more than 'merely colorable.'"  Id. (citations omitted). The nonmoving party's failure to make the requisite showing "entitles the moving party to summary judgment."  Id.

## Background

Peterson filed this action for damages and injunctive relief to redress claims of disability discrimination and claims of federal constitutional violations, naming a number of New Hampshire State Prison ("NHSP") and New Hampshire Department of

Corrections ("DOC") officers and employees as defendants.

Defendants have moved for summary judgment on all claims

remaining in this action.  Plaintiff filed a cross motion for

summary judgment on all claims except Claim IV, as identified

below.

I.   <u>Claims</u>

     This court has identified the claims remaining in this

action as the following[1]:

> Claim I:  Defendants DOC Commissioner William Wrenn, NHSP
> Warden Richard Gerry, DOC Commissioner's Office employee
> Christopher Kench, DOC Hearing Officer Lester Eldridge,
> NHSP Cpl. Roger Provost, and NHSP Corrections Officer
> ("C.O.") Kelly Jardine discriminated against Peterson based
> on his disability, paruresis,[2] in violation of Peterson's
> rights under Title II of the Americans with Disabilities
> Act ("ADA"), in that they subjected Peterson to
> disciplinary penalties for failing to urinate for a drug
> test and did not follow the conditions of Peterson's NHSP
> "voiding pass," which had been issued as an accommodation
> for Peterson's urine retention problem.

> Claim II: Defendants NHSP Lt. John Masse and Capt. Charles
> Boyijian violated Peterson's First and Fourteenth Amendment
> right of access to the courts, in that in February/March

---

[1]The claims in this case were identified and numbered in the
court's Sept. 16, 2015 Report and Recommendation (Doc. No. 31).
The court in this Order renumbers and reorders the claims
remaining in this action as Claims I-IV.

[2]Paruresis, sometimes called "shy bladder syndrome," is a
type of social phobia that can make it difficult to urinate in
the presence of others.  <u>Wilke v. Cole</u>, 630 F. App'x 615, 616
(7th Cir. 2015) (citing APA, <u>Diagnostic and Statistical Manual
of Mental Disorders</u> 300.23 (5th ed. 2013)).

2013, they seized Peterson's legal files and lost some of
the files, while Peterson was preparing to litigate a state
post-conviction proceeding, which actually hindered
Peterson's ability to litigate a claim in that proceeding.

Claim III: NHSP Defendants Capt. Paul Cascio, Lt. Michael
Marden, Maj. Jon Fouts, DOC Hearings Officer Brian Baxter,
and Christopher Kench retaliated against Peterson for
exercising his First Amendment right to petition the
government for a redress of grievances, in that they caused
Peterson to be charged and found guilty of the disciplinary
offense of "disrespect" because Peterson had complained, in
an inmate request slip ("IRS"), that Cascio had lied to
Peterson; and

Claim IV: Defendant NHSP Capt. Cascio retaliated against
Peterson for exercising his First Amendment right to
petition the government for a redress of grievances, in
that he withheld $35 in back pay owed to Peterson for work
he did in the Residential Treatment Unit ("RTU"), after
Peterson stated in an IRS that Cascio had lied.

Peterson brings Claim I against defendants in their official

capacities, and brings the remaining claims (Claims II-IV)

against defendants in their individual capacities.


## II.  Undisputed Facts

### A.   Drug Test and Urine Retention

On March 7, 2013, Peterson was ordered to provide a urine

sample for a drug test.  NHSP Cpl. Roger Provost escorted

Peterson off his residential unit to procure a urine sample.

See Appeal of 30A, Apr. 27, 2013 (Doc. No. 57-13, at 2).

Provost gave Peterson small quantities of water every half hour

for two hours to furnish a sample.  See id.; DOC Disciplinary

Report, Mar. 10, 2013 (Doc. No. 41-16, at 1).  When Peterson

4

nonetheless failed to urinate, Peterson received an additional period of time to do so.  See Doc. No. 57-13, at 2; Doc. No. 41-16, at 1.  Peterson still failed to produce a urine sample.  See Doc. No. 57-13, at 2; Doc. No. 41-16, at 1.

Provost prepared a disciplinary report about the incident and charged Peterson with a substantial delay in furnishing a urine sample for a drug test, in violation of Rule 30.A of the DOC disciplinary rules for inmates.  See Doc. No. 41-16. Provost noted in the report that although Peterson "is medically documented with a urinary retention problem," that did not "exclude him from producing a urine sample."  See id. at 2.  The reviewing officer, Officer Kelly Jardine, noted that Peterson had an old "voiding pass" in his inmate records.  See id.; see also DOC Inmate Alert Search report, voiding pass (Doc. No. 49-7, at 1).  Lt. John Masse recommended that the disciplinary report be processed as a major offense, and Maj. Jon Fouts approved that recommendation.  See Doc. No. 41-16, at 2.

After receiving Provost's disciplinary report, Peterson submitted an IRS to NHSP physician Dr. Celia Englander on March 20, 2013, asking her to "review [Peterson's] medical records and explain the precise details of [his] voiding pass."  See Decl. of Dr. Celia A. Englander Apr. 14, 2016 (Doc. No. 41-18) ("Englander Decl.") ¶¶ 1, 5, 8; IRS, Mar. 20, 2013 (Doc. No.

41-20).  In her March 21 response to that IRS, Dr. Englander wrote, "I reviewed all volumes of your record.  On December 18, 2002, Dr. Freedman wrote a voiding pass stating that you were to be given 10 oz. of water, a dry cell, a cup and an (one) hour to produce a urine sample."[3]  IRS Response, Mar. 21, 2013 (Doc. No. 41-20); see also Englander Decl. ¶ 7.

At the hearing on the March 2013 disciplinary report, DOC Hearing Officer Lester Eldridge accepted Dr. Englander's March 21 response to Peterson's IRS as evidence, along with a report of similar statements she made to Lt. Masse who asked her to explain Peterson's voiding pass.  See DOC Hearings Results, Mar. 24, 2013 (Doc. No. 41-16, at 4-5).  Eldridge found Peterson guilty of the charged offense and sentenced him to disciplinary penalties.  See id. at 4.  Peterson's appeal was unsuccessful. See Doc. No. 57-13, at 1; Doc. No. 57-16, at 1.

Approximately ten years before, in December 2002, Peterson had been found guilty of a similar charge.  See Appeal of 30A, Dec. 20, 2002 (Doc. No. 56-7, at 5).  Peterson appealed the December 2002 guilty finding.  Id.  The Warden's office granted

---

[3]A copy of the voiding pass is an exhibit to defendants' motion for summary judgment.  The pass lists "urinary retention" as Peterson's "complaint/problem," and states, "If inmate unable to void on demand gradually give 10 oz. of water and place in a dry tank x 1 hour [with] a cup."  DOC Medical Restriction Pass, Dec. 18, 2002 (Doc. No. 41-19) (emphasis in original).

the appeal and directed that Peterson be returned to a lower
custody status "due to medical documentation of pre-existing
issues." See G. Crompton, Warden's Response to Appeal of 30A,
Jan. 21, 2003 (Doc. No. 56-7, at 5, 6).  Disciplinary reports
were also issued in December 2006 and January 2007, charging
Peterson with failing to furnish urine samples as required on
December 16, 2006 and January 5, 2007.  See DOC Disc. Rep., Dec.
21, 2006 (Doc. No. 56-6, at 1 – 2); DOC Disc. Rep., Jan. 18,
2007 (Doc. No. 56-5, at 1 – 2).  It is undisputed that the
hearing officer in December 2006 threw out the December 2006
charge, based on the December 2002 voiding pass, see Doc. No.
56-4, at 2.  The disposition of the January 2007 charge is not
part of this court's record.

B.   Seizure of Legal Files

On February 15, 2013, Peterson was transferred to the NHSP
Hancock Building, where he was assigned to a cell with seven
other inmates.  See Decl. of John Masse, Apr. 12, 2016 (Doc. No.
41-21) ("Masse Decl.") ¶ 2.  Peterson arrived with a number of
55-gallon trash bags of personal property, including legal
paperwork.  See id.  Capt. Boyijian and Lt. Masse allowed
Peterson to have one bag of legal paperwork in his cell at a
time, with the remainder to be stored in the Hancock Building
property room.  See id.

Peterson specifically asked to "receive the remainder of [his] legal paperwork" in March 2013.  Masse Decl. ¶ 8.  He was allowed to enter the Hancock Building property room for that purpose on or around March 29, 2013.  Id.; IRS Response Apr. 1, 2013 (Doc. No. 41-24).  Peterson's March 31, 2013 IRS states that Peterson located only three bags out of what he believed should have been four bags of legal files.  IRS Mar. 31, 2013 (Doc. No. 41-25).  Peterson's April 2013 inmate request slips state his belief that he was "missing files."  IRS Apr. 3, 2013 (Doc. No. 41-24); IRS Apr. 11, 2013 (Doc. No. 58-13).

C.   Peterson's Post Conviction Litigation

Peterson—who had been working on a post-conviction brief at the time of his transfer to the Hancock Building, see IRS Feb. 21, 2013 (Doc. No. 53-5, at 1—filed a "motion to correct illegal sentence" in the state Superior Court on April 19, 2013.  See Mot. to Correct Illegal Sentence, Apr. 17, 2013 (Doc. No. 41-5). Peterson argued in the motion that one of the criminal threatening charges against him should have been merged into the burglary charge against him, and he made reference to two "missing" exhibits, consisting of medical records.  See id. at 9.  The May 2013 Superior Court order denying that motion did not mention any missing exhibits, but only stated that the motion was being denied "for all of the reasons set forth in the

8

State's objection."  Order, May 7, 2013 (Doc. No. 41-6).  Those
reasons did not include the absence of any exhibits.  See
State's Obj. to Def.'s Mot. to Correct Illegal Sentence (Doc.
No. 41-7).

Later that month, Peterson filed, in the Superior Court, a
"Motion for Reconsideration, and Response to the State's
Objection, and Amended Motion to Correct Illegal Sentence" (Doc.
No. 41-8), which made no reference to the fact that any exhibits
were missing from Peterson's original motion.  See id.  The
Superior Court denied Peterson's motion for reconsideration on
June 24, 2013.  See Order, June 24, 2013 (Doc. No. 41-9).  On
October 1, 2013, the Superior Court issued a written order (Doc.
No. 41-10) in response to Peterson's request for detailed
findings of fact and rulings of law.  Observing that, through
his May 2013 motion for reconsideration, Peterson had raised a
double jeopardy claim for the first time, the Superior Court
ruled that that claim had been defaulted and, in any event, was
without merit.  See id. at 2-7.  In May 2013, Peterson filed a
"Motion for Extension of Time to October 29, 2013 to File a
Motion to Reconsider" (Doc. No. 41-11), followed by a "Motion
for Reconsideration of Amended Double Jeopardy Issues" (Doc. No.
41-12), in the Superior Court.  That court granted the motion
for an extension of time, but denied the motion for

reconsideration, stating, "[A]ll of the issues referenced in this motion are untimely raised." Order, Nov. 22, 2013 (Doc. No. 41-13).

### D.   May 2014 Disciplinary Proceedings

On or about May 12, 2014, NHSP Capt. Paul Cascio received an IRS from Peterson, who at that point had recently been transferred from the RTU to the Medium Custody North Unit of the NHSP.  See Decl. of Paul Cascio, Apr. 13, 2016 (Doc. No. 41-26) ("Cascio Decl.") ¶ 2.  Peterson's IRS to Capt. Cascio states:

> You lied to me.  I asked you clearly and directly
> twice if you would recommend South Unit for me upon
> exit from RTU. Both times you said you would.  Then
> Monday you tell me that you recommended EITHER North
> or South.  This is not the same.  This is NOT the
> same!  You lied to me.  I told you the court has taken
> away my hope, that I have little left to live for.  I
> have eight (to me significant) reasons why I want
> South over North unit.  I told you some of these.  I
> worked hard in RTU.  I helped a lot of people,
> including myself.  You did not even show for my
> transition meeting, nor attempt to see me afterwards.
> I thought you had more integrity than this.  Am I
> wrong? Mistaken?  If you do nothing you will confirm
> my misgiving.

Id. ¶ 2; Doc. No. 41-27.  Capt. Cascio responded by notifying Peterson that his comments in the IRS were disrespectful and condescending, and that Peterson would be receiving a disciplinary report.  See id.

Rule 14 of the DOC disciplinary rules prohibits "[i]nsubordination or disrespect toward a staff member."  Doc.

10

No. 41-15, at 9.  Cascio issued a disciplinary report to Peterson for violating Rule 14.  See id. ¶ 3.  Cascio intended that Peterson should be subjected to major disciplinary penalties for accusing Cascio of lying and questioning his integrity.  See id. ¶ 5; Doc. No. 41-7, 2.  Maj. Fouts recommended that the charges go forward as a minor disciplinary offense.  Doc. No. 41-7, 2.

At the ensuing hearing, Peterson admitted that the IRS was disrespectful.  See id. at 4.  Hearing Officer Brian Baxter found Peterson guilty and sentenced him to disciplinary sanctions consisting of twenty-five days of extra duty, and a loss of canteen and visiting privileges for twenty days.  See id.  The loss of canteen and loss of visiting privileges were suspended for ninety days.  See id.

   E.  Back Pay

Peterson asserted in the pleadings that he believed Cascio played a role in denying Peterson $35.00 in back pay, since July 2014, for work Peterson performed while in the RTU.  It is undisputed that Peterson did not file any IRS between May 1 and December 31, 2014, asserting a claim for "back pay."  See Decl. of Cynthia Crompton, Apr. 12, 2016 (Doc. No. 41-28) ¶ 3.

**Discussion**

I.   ADA Claims (Claim I)

In Claim I, plaintiff alleges that defendants discriminated against him on the basis of his paruresis, when they subjected him to major disciplinary sanctions for failing to furnish a urine sample on March 7, 2013.  Plaintiff and defendants have each moved for summary judgment on that claim.

Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in, or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  To establish a violation of Title II, a plaintiff "must establish: (1) he is a qualified individual with a disability; (2) that he was excluded from participating in, or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of his disability." Kiman v. N.H. Dep't of Corr., 451 F.3d 274, 283 (1st Cir. 2006) (internal quotation marks and citation omitted).

A.   Qualified Individual with Disability

1.   Defendant's Motion as to Disability

With respect to whether the plaintiff can proceed to trial on a Title II claim as described in Kiman, 451 F.3d at 283, the plaintiff must show either that he had a disability, that he had a record of having a disability, or that he was "regarded as" having such a disability. 42 U.S.C. § 12102(1).  Peterson's claim is that he has paruresis, limiting his ability to urinate. Defendants argue that plaintiff is not a qualified individual with a disability for the purposes of the ADA, because his alleged "paruresis does not substantially limit a major life activity," and they have moved for summary judgment on that ground.  Defs.' Mem. in Supp. of Mot. Summ. J., at 2, 12, 13 (Doc. No. 41-1).

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities."  Id.  To avoid summary judgment on whether he has a disability, plaintiff must show that there are triable issues as to whether (a) he has "a physical or mental impairment," (b) that "affects life activities that are . . . of central importance to daily life," and (c) "substantially limits" those major life activities. Ramos-Echevarria v. Pichis, Inc., 659 F.3d 182, 187 (1st Cir. 2011) (internal quotation marks and

citation omitted); see also Singh v. George Wash. Univ. Sch. of Med. & Health Scis., 667 F.3d 1, 6 (D.C. Cir. 2011) ("To establish a disability under the ADA, a plaintiff must establish not only that she suffers from an impairment but also that the impairment causes a significant limitation on a major life activity.").

Defendants do not directly challenge plaintiff's assertion that he had paruresis, notwithstanding the absence of direct evidence that Peterson had ever been diagnosed with that condition.  It is undisputed that Peterson has been diagnosed at the NHSP with mental health issues including anxiety, that paruresis is an expression of social phobia or anxiety, and that Peterson's medical history at the NHSP has included an episode of urine retention for which he has sought medical attention. Peterson obtained a "voiding pass" prescribed by Dr. Freedman in response to his problem/complaint of urine retention in December 2002.  Prison officials construed Peterson's medical records as documenting a pre-existing condition affecting Peterson's ability to furnish urine for a drug test in December 2002 and 2006.  There is evidence that Peterson's urine retention problems were recurrent and had not resolved completely prior to March 2013, and that DOC officers treated the voiding pass in the relevant time period as though it remained in effect.  The

evidence is sufficient to generate a genuine issue as to whether Peterson had a physical or mental impairment that affected his ability to urinate in March 2013.

All but conceding that urination is a major life activity, defendants argue that Peterson cannot show that he is "substantially limit[ed]" in his ability to urinate.  Defs.' Mem. in Supp. of Mot. Summ. J., at 2, 13 (Doc. No. 41-1).  They note that Peterson claims an inability "to urinate in front of or even beside others," and they argue that those conditions are not disabling, as "most people" tend not to urinate under those conditions.  Defs.' Mem. in Supp. of Mot. Summ. J., at 14-15 & n.2 (Doc. No. 41-1).

As defendants forthrightly acknowledge, each case they cite to support their argument in this regard applies the ADA definition of disability, predating Congress's amendment of the ADA in 2008.  The ADA Amendments Act of 2008 ("ADAAA") was enacted in response to Court rulings, including Toyota Motor Mfg., Ky. v. Williams, 534 U.S. 184, 197 (2002), that established strict and demanding standards for determining whether an impairment qualified as a disability.  As amended, the ADA specifically provides that courts should construe the pertinent definitions "'broadly in favor of expansive coverage,'" Martínez-Rivera v. Puerto Rico, 812 F.3d 69, 78 n.8

(1st Cir. 2016) (quoting 29 C.F.R. § 1630.2(j)(1)(i), (iii));

see also 42 U.S.C. § 12102(a)(4).  The cases cited by defendants

to support their argument regarding whether paruresis

substantially limits the major life activity of urination all

apply pre-ADAAA law, and for that reason, those cases are

neither binding on this court, nor persuasive, given that they

do not construe the pertinent definitions broadly in favor of

expansive coverage, as Congress intended in amending the ADA.[4]

The Equal Employment Opportunity Commission regulations

implementing the pertinent ADA definitions, as amended, make it

clear that while not every impairment is a disability under the

ADA, "'[s]ubstantially limits' is not meant to be a demanding

standard."  29 C.F.R. § 1630.2(j)(1)(i).  Although an

"impairment is a disability . . . if it substantially limits the

ability of an individual to perform a major life activity as

compared to most people in the general population," id.

---

[4]See Defs.' Mem. in Support of Mot. for Summ. Jt., at 14
(citing Rathy v. Wetzel, No. 13-cv-72, 2014 U.S. Dist. LEXIS
115331, at *10-*13, 2014 WL 4104946, at *5-*6 (W.D. Pa. July 28,
2014), R&R approved by 2014 WL 4104946, at *1, 2014 U.S. Dist.
LEXIS 114670 (W.D. Pa. Aug. 19, 2014); Terbush v. Massachusetts,
987 F. Supp. 2d 109, 121 & n.7 (D. Mass. 2013); Linkous v.
CraftMaster Mfg., Inc., No. 7:10-CV-00107, 2012 U.S. Dist. LEXIS
98441, at *10, 2012 WL 2905598 (W.D. Va. July 16, 2012);
Balistrieri v. Express Drug Screening, LLC, No. 04-C-0989, 2008
U.S. Dist. LEXIS 26839, at *13-*14, 2008 WL 906236 (E.D. Wis.
Mar. 31, 2008).

§ 1630.2(j)(1)(ii), an "impairment need not prevent, or
significantly or severely restrict, the individual from
performing a major life activity in order to be considered
substantially limiting."  Id.  Moreover, an impairment can be
episodic and still qualify as a disability, if it imposes a
substantial limitation when it is active.  See id.
§ 1630.2(j)(1)(vii).

Defendants' argument about what most people "tend" to do
misses the mark by construing the term "substantially limits"
without reference to the undisputed facts regarding Peterson.
Speculation about people's tendencies is not particularly
illuminating here.  Peterson as a prisoner is subject to
constraints that are not generally applicable.  The pertinent
definition requires an "individualized assessment," 29 C.F.R.
§ 1630.2(j)(1)(iv).

Construing the pertinent definitions broadly in favor of
expansive coverage, and taking into account Peterson's medical
records regarding his urine retention problems while at the
NHSP, this court finds that there is a triable issue in this
case as to whether plaintiff had an impairment substantially
limiting his ability to perform a major life activity, during
the relevant time period.  Accordingly, defendants' motion for
summary judgment is denied, to the extent it asks this court to

conclude, as a matter of law, that Peterson was not a qualified individual with a disability.

### 2.   Plaintiff's Motion as to Disability Issues

Peterson has moved for summary judgment on two issues:  (1) whether he was a qualified individual with a disability, and (2) whether DOC officials regarded him as having a disability in March 2013.  The first issue, as explained above, implicates a disputed material fact regarding whether plaintiff had an impairment that caused his inability to urinate.  There are fact questions as to this issue that cannot be resolved in favor of plaintiff as a matter of law.  For that reason, plaintiff's motion for summary judgment is denied on that issue.

The second issue upon which plaintiff seeks summary judgment is whether plaintiff was "regarded as" having a disability.  "[A] plaintiff bringing a 'regarded as' claim under the ADA needs to plead and prove . . . that [the plaintiff] was regarded as having a physical or mental impairment," whether or not that perceived impairment limits or was perceived to limit a major life activity.  Mercado v. P.R., 814 F.3d 581, 588 (1st Cir. 2016)

Peterson has not previously pleaded a "regarded as" ADA claim in this case.  Neither the original complaint nor any of Peterson's complaint amendments includes a claim that prison

officials regarded plaintiff as having a physical or mental impairment.  Plaintiff may not obtain summary judgment on a new "regarded as" claim that appears for the first time in response to defendants' summary judgment motion, and has never previously been added as a claim to this action.  See Ruiz Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 85 (1st Cir. 2008).  Accordingly, Peterson's motion for summary judgment is denied as to the "regarded as" issue.

B.   Reasonable Accommodation

Title II "require[s] public entities to 'make reasonable modifications in policies, practices or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.'"  Kiman, 451 F.3d at 283 (quoting 28 C.F.R. § 35.130(b)(7)).  A "'reasonable accommodation' is one that gives 'meaningful access' to the program or services sought."  Bibbo v. Mass. Dep't of Corr., No. 08-cv-10746-RWZ, 2010 U.S. Dist. LEXIS 75164, at *4, 2010 WL 2991668, at *1 (D. Mass. July 26, 2010) (citation omitted).

Defendants seek summary judgment on whether the circumstances under which plaintiff was required to furnish a urine sample in March 2013 constituted a "reasonable

accommodation" of Peterson's disability.  Plaintiff maintains
that defendants did not comply with his voiding pass, and that
giving him more time to urinate without giving him privacy
simply did not accommodate his condition.  Plaintiff has moved
for summary judgment on those issues.

While Peterson has not offered any medical expert's
testimony or statement specifically rebutting Dr. Englander's
opinion that the extra time provided to Peterson on March 7
accommodated his documented urinary retention problems, cf.
Englander Decl. ¶ 8, the record before the court also includes
the voiding pass itself, which states Dr. Freedman's
recommendation that Peterson be given extra time, sips of water,
a collection cup, and a "dry tank," as alterations to prison
protocols, see Doc. No. 41-19.  A jury apprised of the different
procedures followed in other similar prisons could conclude that
simply giving Peterson extra time was not a reasonable
accommodation, under the circumstances.

The evidence cited above, while sufficient to defeat
defendants' motion for summary judgment, does not warrant an
order granting plaintiff's cross-motion for summary judgment on
the reasonable accommodation claim.  The ADA does not require
the accommodation of plaintiff's choice.  See Enica v. Principi,
544 F.3d 328, 342 (1st Cir. 2008); see also McElwee v. County of

Orange, 700 F.3d 635, 641 (2d Cir. 2012).  Nor does it require a
defendant to continue to provide the same accommodation that it
has provided in the past.  See Phelps v. Optima Health, Inc.,
251 F.3d 21, 26 (1st Cir. 2001).  A jury, crediting Dr.
Englander's testimony, see Englander Decl. ¶¶ 6, 8, and
considering other relevant evidence in the record, could find
that defendants made reasonable and appropriate modifications to
their drug testing and disciplinary protocols in March 2013 to
accommodate Peterson's asserted disability.  For that reason,
plaintiff's motion for summary judgment is denied on that issue.


II.  Right of Access to Courts (Claim II)

       In Claim II, Peterson claims that defendants Boyajian and
Masse violated his right of access to the courts by seizing
Peterson's legal files.  To prove that his right of access to
the courts has been violated, Peterson must show he was actually
injured in his ability to pursue a nonfrivolous claim in a post-
conviction proceeding or other civil rights matter that Peterson
had a right to litigate.  See Lewis v. Casey, 518 U.S. 343, 352,
354-55 (1996).  Peterson contends that one document lost by
defendants after they seized his paperwork was the Presentence
Investigation Report ("PSI") prepared for the state court's use
in sentencing Peterson.  Peterson further asserts that the

seizure of his case files, resulting in his loss of access to
the PSI and other parts of his criminal case records, actually
hindered his ability to litigate a motion challenging the
validity of his sentence in state court.[5]  Defendants have moved
for summary judgment on Claim II, contending that they did not
impede Peterson's filing of any nonfrivolous post-conviction
matter.

Peterson's motion to correct his sentence, which Peterson
filed in April 2013, asserted as a matter of law that his
sentence and conviction violated his double jeopardy rights.
Peterson's alleged lack of access to the PSI could not have
affected his ability to litigate that motion and the ensuing
motions to reconsider in the state courts, as Peterson's
arguments did not depend on matters in the PSI or on any other
document he has identified as missing.  The Superior Court
denied the motion to correct his sentence, first because the
double jeopardy issue had been waived as it had not been
asserted at trial or in the direct appeal of Peterson's
conviction, and second, because the Superior Court found that

---

[5]This court previously identified Claim II as asserting an
impairment in Peterson's ability to litigate a post-conviction
motion in 2013 in his criminal case, State v. Peterson, No. 218-
1999-cr-0599 (N.H. Super. Ct., Rockingham Cty.).  See Sept. 16,
2015 R&R (Doc. No. 31), at 11, R&R approved by Oct. 13, 2015,
Order (Doc. No. 33).

the double jeopardy claim lacked merit as a matter of law.
Nothing in the record before this court suggests that the lack
of the PSI or any other document allegedly lost by defendants
affected Peterson's ability to litigate those post-conviction
motions.

Peterson counters that if he had in fact retained access to
the lost materials including the PSI, he would have litigated
different claims, and he would have filed a more complete motion
sooner.  Peterson does not state what those unasserted claims
would have been, in a manner that would allow this court to
conclude whether such claims were non-frivolous.  "[T]he
underlying cause of action, whether anticipated or lost, is an
element that must be described in the complaint, just as much as
allegations must describe the official acts frustrating the
litigation."  Christopher v. Harbury, 536 U.S. 403, 415 (2002).
Nothing in the record suggests that a more complete brief filed
earlier in 2013 would have fared better than the briefs Peterson
actually litigated, beginning in April 2013.  As the record does
not provide any non-speculative basis for finding that any non-
frivolous post-conviction claim was actually lost as a result of
defendants' actions, the court grants defendants' motion for
summary judgment on Claim II, and denies plaintiff's cross-
motion on that claim.

## III.  Retaliation (Claims III and IV)

### A.   Claim III

In Claim III, Peterson asserts that defendants retaliated against him, by charging him with disrespect and insubordination for questioning Capt. Cascio's integrity and saying he lied to Peterson in an inmate request slip, and for finding Peterson guilty of that offense and imposing sanctions.  Defendants argue that prison officials did not engage in any actionable, retaliatory acts, and that they are entitled to qualified immunity as to that retaliation claim.

### 1.   Retaliation Standard

To demonstrate that defendants retaliated against Peterson for engaging in protected conduct, Peterson must show: (1) that he engaged in conduct protected by the First Amendment; (2) that he suffered non-de minimis adverse action at the hands of the prison officials; and (3) that there was a causal link between the exercise of his First Amendment rights and the adverse action taken.  See Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011); Starr v. Dube, 334 F. App'x 341, 342 (1st Cir. 2009).  An adverse act taken in response to an inmate's protected conduct is not de minimis if it would deter an inmate of ordinary

firmness from exercising First Amendment rights.  See Starr, 334 F. App'x at 342.

There is no dispute here that disciplinary sanctions were imposed on Peterson based on the words Peterson used in the May 2014 IRS, letting Capt. Cascio know that Peterson questioned his integrity and believed Cascio had been dishonest.  It is also undisputed that Peterson incurred disciplinary penalties (twenty-five days extra duty and twenty days loss of certain privileges, suspended) when he was found guilty of the disciplinary offense of disrespect.

While there is authority for the proposition that non-severe sanctions for a minor disciplinary charge, even if imposed in allegedly retaliatory disciplinary proceedings, do not give rise to actionable retaliation claims,[6] this court need not find that the consequences of the disciplinary report here were de minimis in ruling on the pending cross-motions for

---

[6]See, e.g., Morris v. Powell, 449 F.3d 682, 685 (5th Cir. 2006) ("'a single incident, involving a minor sanction, is insufficient to prove [retaliatory] harassment'" (quoting Gibbs v. King, 779 F.2d 1040, 1046 (5th Cir. 1986) (inmate charged and convicted once of unposted policy, and then subjected to two-week loss of store privileges did not prove harassment in retaliation for complaining about guard's conduct); see also Starr v. Dube, 334 F. App'x 341, 343 (1st Cir. 2009) (false disciplinary charge that was filed for retaliatory reasons and carried risk of severe sanctions was not actionable where inmate had fair opportunity to defend himself in disciplinary proceedings, it was not futile for inmates to defend themselves, and disciplinary report was dismissed).

summary judgment.  For reasons stated below, even if the court were to assume, without deciding, that Peterson endured actionable, retaliatory consequences, capable of deterring an inmate of ordinary firmness from engaging in protected speech, defendants are entitled to qualified immunity with respect to Peterson's IRS and the ensuing disciplinary proceedings.

### 2.   Qualified Immunity

A government official named as a defendant in a prisoner civil rights action "'is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct.'" Hunt v. Massi, 773 F.3d 361, 367 (1st Cir. 2014) (citation omitted).  Qualified immunity "protect[s] government functionaries who could not reasonably have predicted that their actions would abridge the rights of others, even though, at the end of the day, those officials may have engaged in rights-violating conduct." Camilo-Robles v. Zapata, 175 F.3d 41, 43 (1st Cir. 1999).  Qualified immunity "'protects all but the plainly incompetent or those who knowingly violate the law.'" Hunt, 773 F.3d at 367 (citation omitted).  When a defendant invokes qualified immunity, the burden is on the plaintiff to show the inapplicability of the defense.  See Rivera-Corraliza v. Puig-Morales, 794 F.3d 208, 215 (1st Cir. 2015).

In determining whether a defendant has qualified immunity, the court "must decide (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Rocket Learning, Inc. v. Rivera-Sánchez, 715 F.3d 1, 8 (1st Cir. 2013) (citations and internal quotation marks omitted).  In appropriate cases, the court may forego consideration of the first part of the inquiry and decide the matter solely on the question of whether the right at issue was "clearly established."  See Pearson v. Callahan, 555 U.S. 223, 236 (2009).

The "clearly established" part of the inquiry has two related aspects:  (1) the clarity of the law "at the time of the alleged violation"; and (2) the clarity of the law with respect to the "specific facts of the case at bar." Rocket Learning, 715 F.3d at 9.  The focus on the time of the alleged violation means that "then-existing" precedent must have "'placed the statutory or constitutional question . . . beyond debate.'" Rivera-Corraliza, 794 F.3d at 215 (citations omitted).  In other words, "controlling authority" in the relevant jurisdiction, or -- in the absence of controlling law -- a "robust consensus of persuasive authority" existed, making the conduct undebatably

illegal at the time of the alleged violation.  Id. at 214-15
(citations and internal quotation marks omitted).

The second aspect of the "clearly established" inquiry
"considers the specific facts of the case at bar."  Rocket
Learning, 715 F.3d at 9.  The "clearly established" inquiry must
be undertaken in light of the specific context of the case, not
as a broad general proposition.  Thus, "[t]he relevant,
dispositive inquiry in determining whether a right is clearly
established is whether it would be clear to a reasonable
[official] that his conduct was unlawful in the situation he
confronted."  Id. (emphasis in original) (citations and internal
quotation marks omitted).

The "clearly established" inquiry here is the following:
Would it have been clear to a reasonable officer in May 2014
that an inmate's questioning of an officer's integrity, and
accusations that the officer lied, when asserted in a grievance
addressed to that officer, was protected speech that could not
result in prison disciplinary sanctions?  Neither the First
Circuit nor the Supreme Court has addressed that question
directly, and there is no controlling law in this jurisdiction,
derived from any closely analogous case.

There are Ninth Circuit cases cited by Peterson that
support a finding of liability here.  See, e.g., Brodheim v.

Cry, 584 F.3d 1262, 1271 (9th Circ. 2009); Bradley v. Hall, 64 F.3d 1276, 1282 (9th Cir. 1995) ("prison officials may not punish an inmate merely for using hostile, sexual, abusive or threatening language in a written grievance" (internal quotation marks omitted)), overruled on other grounds by Shaw v. Murphy, 532 U.S. 223, 230 n.2 (2001).  The existence of such Ninth Circuit authority, however, does not manifest the type of robust consensus of persuasive authority that could overcome a qualified immunity defense here.  Courts in other jurisdictions have concluded that inmates who inject libels and insults in grievance forms can be sanctioned for using disrespectful language.  See, e.g., Hale v. Scott, 371 F.3d 917, 918 (7th Cir. 2004) (inclusion of libelous rumor of guard's sexual misconduct, in context of grievance on unrelated issue regarding that guard, was not protected speech); Parker v. Chavis, No. 1:08-CV-416, 2010 U.S. Dist. LEXIS 100190, at *8, *10, 2010 WL 3787898, at *3, *4 (M.D.N.C. Sept. 21, 2010) (inmate's First Amendment rights were not violated when he was subjected to disciplinary proceedings for calling officer a "jerk" in grievance, as "[t]he purpose of the prison grievance procedure is to bring issues to the attention of prison officials, not to make offensive or disparaging remarks about individuals, nor to air personal or petty opinions and disagreements"), R&R approved, No. 1:08-CV-

416 (M.D.N.C. Mar. 7, 2011) (ECF No. 27).  Cf. Roberts v. Jones,
No. CIV-11-143-M, 2012 U.S. Dist. LEXIS 45106, at *10, 2012 WL
1072218, at *2 (W.D. Okla. Feb. 29, 2012) (qualified immunity
defense was available to prison officials who subjected inmate
to disciplinary proceedings for using disrespectful language in
grievances, as Ninth Circuit case law did not bind court in
Tenth Circuit), R&R approved, No. CIV-11-143-M, 2012 U.S. Dist.
LEXIS 45132, 2012 WL 1142514 (W.D. Okla. Mar. 30, 2012).

A reasonable prison official within the First Circuit in
2014 could conclude that the First Amendment did not prevent a
prison officer from initiating disciplinary proceedings for an
inmate's criticizing a supervisory corrections officer by
questioning his integrity and truthfulness on a form used in the
grievance process.  Peterson has not shown that the illegality
of the disciplinary proceedings resulting from the May 2014 IRS
was beyond debate when and where it occurred.  Accordingly,
defendants are entitled to qualified immunity on Claim III.
Their motion for summary judgment on that claim is granted.
Plaintiff's cross-motion for summary judgment is denied as to
Claim III.

B.   Exhaustion (Claim IV)

In Claim IV, Peterson asserts that Capt. Cascio retaliated
against him by withholding $35.00 in back pay since July 2014.

30

Defendants argue that Peterson did not exhaust this claim through the prison grievance system.  Peterson's cross motion for summary judgment does not seek summary judgment on Claim IV, and Peterson has not specifically objected to defendants' motion for summary judgment on this claim.

Under the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  The PLRA requires "proper exhaustion."  Woodford v. Ngo, 548 U.S. 81, 84 (2006).  "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."  Jones v. Bock, 549 U.S. 199, 218 (2007).  Claims for which administrative remedies have not been exhausted are subject to dismissal.  Medina-Claudio v. Rodríguez-Mateo, 292 F.3d 31, 36 (1st Cir. 2002).  Failure to exhaust is an affirmative defense.  See Ramos v. Patenaude, 640 F.3d 485, 488 (1st Cir. 2011).

At all times relevant to this matter, the DOC employed a three-level procedure for handling inmate grievances.  DOC Policy and Procedure Directive ("PPD") 1.16(III)(E).  The first step is an IRS that "must be received within 30 calendar days of

31

the date on which the event complained of occurs."  PPD
1.16(IV)(A)(1) (Doc. No. 41-29, at 2).  The second and third
steps are grievances, which are also subject to thirty-day
deadlines.  PPD 1.16(IV)(B)&(C)(1) (Doc. No. 41-29, at 3-4).
The timeframes set forth in PPD 1.16 and the use of appropriate
forms are mandatory requirements.  PPD 1.16(IV)(E)&(F) (Doc. No.
41-29, at 4-5).

Peterson did not grieve his back pay claim at any time
between May 1 and December 31, 2014.  Peterson thus failed to
exhaust available administrative remedies on that claim,
rendering it subject to dismissal.  Accordingly, defendants'
motion for summary judgment on Claim IV is granted.

## Conclusion

For the foregoing reasons, the court grants in part and
denies in part defendants' motion for summary judgment (Doc. No.
41).  Defendants' motion (Doc. No. 41) is granted to the extent
it seeks summary judgment on Claims II, III, and IV, and is
denied as to Claim I.  Plaintiff's cross-motion for summary
judgment (Doc. No. 49) is denied in its entirety.  Counsel for
defendants and plaintiff are directed to confer, and to file

proposed revisions to the pretrial schedule in this case, on or

before February 28, 2017.

        SO ORDERED.

        _____
                Landya B. McCafferty
                United States District Judge

January 30, 2017

cc:   Warren E. Peterson, pro se
      Kenneth A. Sansone, Esq.
      Elizabeth Mulholland, Esq.
      Nancy J. Smith, Esq.